IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MOSES JALLOH  :

      :

  v. : Civil Action No. DKC 2005-2354

      :

TARGET CORPORATION

      :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case are: (a) Plaintiff Moses Jalloh's motion for summary judgment (paper 32); and (b) Defendant Target Corporation's motion for summary judgment (paper 33). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the court will deny Plaintiff's motion and grant Defendant's motion.

**I. Background**

The following facts are undisputed unless otherwise noted. In October 2003, Plaintiff, a male of African descent, began working for Defendant at its Germantown, Maryland, store. Plaintiff initially was employed as a cashier. In February 2004, he moved to the position of Target Protection Specialist ("TPS") in the store's security department. As a TPS, Plaintiff's "highly visible" role was to provide "security, safeness, and reassurance to [customers] and [employees]." (Paper 33, ex. 11, TPS job description). In performing this role, Plaintiff, among other things, was required to greet and smile at customers and to provide "fast, friendly

attention" to them, to perform "exposed merchandise checks," and to inspect merchandise receipts.  *Id*.  In addition to TPSs, Defendant also employs Asset Protection Specialists ("APSs"), plainclothes security personnel who walk through the store trying to apprehend shoplifters.  Both TPSs and APSs report to the store's Executive Team Leader of Asset Protection ("ETLAP"), who is the head of security for the store.  The ETLAPs in a district report to the District Asset Protection Leader ("DAPTL").

In February 2004, at the beginning of his employment as a TPS, the ETLAP for Defendant's Germantown location was Peter Sobek. After Mr. Sobek's departure in February or March 2004, Shedrick Cure acted as the ETLAP for the store until May 2004.  From May 2004 until September 2004, Wendy Guertin, the ETLAP at Defendant's Frederick, Maryland, location, would visit the Germantown store two to three times a week and act as head of security for the Germantown store during her visits.  Brian Kruise took over as the ETLAP for the Germantown location in September 2004.  At all relevant times, the DAPTL for the district within which the Germantown store was located was Allen Dorak.  Mr. Dorak began his employment with Defendant in April 2004 and was in training until June 2004, when he assumed responsibility over the district.

Plaintiff testified that in May 2004, Ms. Guertin sent an e-mail to seventeen stores indicating that Mr. Dorak wanted TPSs to greet each customer who entered and left the store.  Plaintiff also

2

stated that Ms. Guertin instructed him to remain by the "blue doors," the main doors through which most customers entered and left the store, in order to greet the customers.  Plaintiff testified that he noticed other TPSs moving about the store and complained to Ms. Guertin, who again told him to stand by the blue doors.

In addition to communicating that TPSs should greet all customers, Mr. Dorak also sought to ensure that TPSs, as well as APSs and ETLAPs were working some weekends and evenings because Defendant's stores were open during these times.  In his declaration, Mr. Dorak stated that Defendant's stores do not have a full staff of security working from opening to closing every day.  Instead, the stores have a budgeted number of hours for security personnel each week.  Mr. Dorak stated that it is important to have security personnel work at varied times (i.e., weekdays, evenings, and weekends) so that shoplifters do not know when security personnel are present.

On August 6, 2004, at Plaintiff's request, Mr. Dorak met with Plaintiff to explain that Plaintiff, along with other security employees, would have to be available to work some evenings and weekends.  Plaintiff told Mr. Dorak that he was available only until six o'clock in the evening.  Mr. Dorak stated in his declaration that Plaintiff told him the scheduling limitation was due to transportation issues but that he was moving soon and needed

3

a few weeks before he was able to work evening hours.  In response, Mr. Dorak offered to give Plaintiff until October before he would be scheduled to work evenings and told Plaintiff that if he could not handle the evening schedule, he might be able to work as a cashier if the store team leader agreed to the transfer.[1]  (Paper 33, ex. B at 2).  Following the meeting, from August 2004 through October 1, 2004, Plaintiff worked some weekends, but did not work past six o'clock p.m.

Plaintiff testified that, in September 2004, after Mr. Kruise assumed the role of ETLAP for the Germantown store, he was able to move about the store more freely than when Ms. Guertin was acting as the store's ETLAP.  Nevertheless, Plaintiff resigned from his job on October 1, 2004.  On October 11, 2004, Plaintiff began a new job with J.C. Penny that paid more than his previous job as a TPS with Defendant.

On February 2, 2005, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant discriminated against him on the basis of national origin.  (Paper 2, ex. 2).  In the charge, Plaintiff stated that on August 6, 2004, he was forced to resign from his position because he was treated unfairly as compared to

---

[1] Plaintiff testified that the two never discussed transportation issues during the meeting. (Paper 33, ex. A at 100).  There is no dispute that Mr. Dorak gave Plaintiff until October 1, 2004, before he would have to begin working evenings. (Paper 36, at 2).

4

American employees.[2]  *Id*.  Plaintiff stated that Defendant changed his work schedule and restricted him to working in one area.  On May 13, 2005, the EEOC dismissed Plaintiff's charge because it was unable to conclude that the information obtained in its investigation established a violation of law.  (Paper 2, ex. 1).

On July 22, 2005, Plaintiff filed suit in the Circuit Court for Montgomery County, Maryland.[3]  Plaintiff, proceeding *pro se*, alleges that he was discriminated against on the basis of his national origin in violation of Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e, *et seq.*).  Plaintiff claims that he was forced to resign because Defendant discriminated against him when it changed his work schedule and restricted him to work in one area.  On August 26, 2005, Defendant removed the case to this court on the basis of federal question jurisdiction.

**II.  Motions for Summary Judgment**

**A.  Standard of Review**

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477

---

[2] There is no dispute that Plaintiff did not actually resign from his job until October 1, 2004.

[3] The date listed on the "Civil Non-domestic Information Report" from the circuit court is July 22, 2005, (paper 2, ex. 3), but in its removal petition Defendant states that Plaintiff filed suit on July 30, 2005, (paper 1, at 1).

5

U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1987). The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he or she is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence

of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

When faced with cross-motions for summary judgment, as in this case, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). *See also havePower, LLC v. Gen. Electric Co.*, 256 F.Supp.2d 402, 406 (D.Md. 2003) (citing 10A Charles A. Wright and Arthur R. Miller, Federal Practice & Procedure § 2720 (3rd ed. 1983)).  The court reviews each motion under the familiar standard for summary judgment, *supra*. The court must deny both motions if it finds there is a genuine issue of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment."  10A Federal Practice & Procedure §2720.

**B.   Analysis**

**1.  Defendant's motion for summary judgment**

Defendant, in its motion for summary judgment, argues that Plaintiff's claim fails because he was not constructively discharged, but voluntarily resigned from his position, and because Defendant had nondiscriminatory reasons for its actions.  (Paper 33, at 7-10).

There are two methods for proving intentional discrimination in employment: (1) through direct or indirect evidence of intentional discrimination, or (2) through circumstantial evidence under the three-step, burden-shifting scheme set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  For the first method, an employee may utilize "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 391 (4th Cir. 2001) (internal quotation marks omitted), *cert. denied*, 535 U.S. 933 (2002).  In order to overcome a summary judgment motion based upon this method of proof, the plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Id.* (internal quotation marks omitted).  More specifically, the plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly

8

on the contested employment decision." *Id.* at 391-92 (internal quotation marks omitted). If such evidence is lacking, the plaintiff nevertheless may proceed under *McDonnell Douglas*. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Under the *McDonnell Douglas* framework, the plaintiff first must establish a *prima facie* case of discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802. Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to present a legitimate, nondiscriminatory reason for the adverse employment action alleged. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If the defendant succeeds in doing so, that will rebut the presumption of discrimination raised by the plaintiff's *prima facie* case. *See Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000) (citing *Burdine*, 450 U.S. at 255 n.10). The plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 253).

To establish a *prima facie* case of unlawful discharge, Plaintiff must demonstrate that: "(1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the job and performed the job satisfactorily; (3) in spite of plaintiff's qualifications and performance, plaintiff was discharged; and (4) the position remained open to similarly qualified applicants after plaintiff's dismissal." *Rankin*, 28 F.Supp.2d at 340. The third prong may be satisfied by showing either an actual or, as alleged here, a constructive discharge.

Plaintiff's claim fails because he has not proffered evidence sufficient to show that he was constructively discharged. "In this circuit, the standard for constructive discharge requires a plaintiff to show both intolerable working conditions and a deliberate effort by the employer to force the employee to quit." *Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993), *cert. denied*, 513 U.S. 806 (1994).

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign. Rather "[i]ntolerability . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign," *Bristow* [*v. Daily Press, Inc.*], 770 F.2d [1251] at 1255 [(4th Cir. 1985)] (emphasis added) – that is, whether he would have had *no choice* but to resign.

10

*Blithstein v. St. John's College*, 74 F.3d 1459, 1468 (4th Cir. 1996), *overruled on other grounds by Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998) (emphasis in original).

Deliberateness can be shown "by actual evidence of intent by the employer to drive the employee from the job, or circumstantial evidence of such intent, including a series of actions that single out a plaintiff for differential treatment. *Johnson*, 991 F.2d at 131 (citing *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981) (stating that the "fact that employees were treated identically rebuts any inference" of constructive discharge)).

There is no evidence that Plaintiff was subjected to objectively intolerable working conditions or that Defendant deliberately intended to drive Plaintiff to resignation. Neither the addition of some evening and weekend hours to Plaintiff's schedule, nor the requirement that he stand by the blue doors and greet customers, constitutes an intolerable working condition that leaves Plaintiff with no choice but to resign. *See Williams v. Giant Food Inc.*, 370 F .3d 423, 434 (4th Cir. 2004) (finding that the plaintiff was not constructively discharged where she alleged that her supervisors yelled at her, told her she was a poor manager, gave her poor evaluations, chastised her in front of customers, and required her to work with an injured back because, even if the plaintiff's allegations were true, these actions were not objectively intolerable); *Jeffers v. Thompson*, 264 F.Supp.2d

314, 329 (D.Md. 2003) ("Title VII does not remedy everything that makes an employee unhappy."); *Rankin v. Greater Media, Inc.*, 28 F.Supp.2d 331, 342 (D.Md. 1997) ("[A]n employee's dissatisfaction with work assignments does not show constructive discharge."). In fact, although Plaintiff alleges in the Complaint (paper 2) that he was forced to resign (i.e., constructively discharged) on August 6, 2004, all evidence, including Plaintiff's deposition testimony, shows that he did not actually resign until October 1, 2004. The delay in Plaintiff's actual resignation negates any notion that Plaintiff was left with no choice but to resign on August 6, 2004, after his meeting with Mr. Dorak.

Moreover, there is no evidence that Defendant's actions were taken with an intent to drive Plaintiff to resign. The evidence shows that Defendant, through Mr. Dorak, sought to ensure that all individuals employed in the TPS position remained by the main entrance to the store to fulfill their primary role of greeting customers. Mr. Dorak required security personnel to work some evenings and weekends, so that the store had security coverage at various times to dissuade potential shoplifters. Plaintiff proffers no evidence that Defendant applied these policies only to Plaintiff, with the intention of having Plaintiff resign.[4]

---

[4] Plaintiff's unsubstantiated assertion that one TPS, whom Plaintiff refers to as "Mr. George," did not have his work schedule changed, is insufficient to show that Defendant's changes to Plaintiff's work schedule were designed to make Plaintiff resign
(continued...)

Plaintiff testified in his deposition that Ms. Guertin sent an e-mail out to seventeen stores articulating the policy of having TPSs greet each customer entering and leaving the store. There is also evidence that Mr. Dorak, in an attempt to retain Plaintiff as an employee, suggested that he transfer back to the cashier position if he was unable to change his work schedule to include evenings. Accordingly, Plaintiff cannot show that he was constructively discharged and fails to assert a *prima facie* case of discrimination.[5]

## 2. Plaintiff's motion for summary judgment

Plaintiff's motion for summary judgment states, in its entirety: "The plaintiff is requesting for the court to enter judgment without trail [sic] [i]n favor of the plaintiff, because the defendant is not having [sic] enough evidence and failed to answer and produce documents to the Plaintiff. The Defendant also failed to keep to the court['s] scheduling order." (Paper 32, at 1). Contrary to Plaintiff's conclusory assertion, Defendant has proffered evidence sufficient to warrant a grant of summary

---

[4](...continued)
from his job. Even if Plaintiff could establish that this individual's work schedule was not altered and could create some question as to whether Defendant acted intentionally, Plaintiff still could not show that his working conditions were so intolerable that he had no choice but to resign.

[5] Because Plaintiff fails to assert a *prima facie* case of discrimination, the court need not consider Defendant's alternative argument that it asserted a legitimate non-discriminatory reason for its actions.

judgment in its favor and a denial of Plaintiff's motion for summary judgment.  In addition, although Plaintiff asserts that Defendant failed "to answer and produce documents," Plaintiff does not specify which documents or which "answers" were not provided or were insufficient, or how these insufficiencies impacted Plaintiff's ability to proffer evidence sufficient to withstand Defendant's summary judgment motion or to warrant a grant of summary judgment in his favor.  Plaintiff has not filed a motion to compel answers to interrogatories or the production of documents.  Moreover, according to Defendant's January 19, 2006, status report (paper 25) and its opposition memorandum (paper 35), Plaintiff did not properly serve his discovery requests because he sent the requests directly to Target Corporation and not to counsel for Defendant as required pursuant to Fed.R.Civ.P. 5(b).[6]  Despite this error, which Plaintiff apparently never reconciled, Defendant still responded to the requests.  With regard to the alleged violation of the scheduling Order (paper 12), Plaintiff does not specify which aspects of the scheduling Order were violated or how these violations relate to or impact his claim.  Defendant filed both its status report and its summary judgment motion in compliance with the scheduling Order.  To the extent that Plaintiff's argument is

---

[6] Fed.R.Civ.P. 5(b) requires service to be made on the attorney unless the court orders service on the party, which the court did not do in this instance.  Plaintiff does not dispute that his requests were served directly on Target Corporation and not Defendant's attorney.

14

based on Defendant's late discovery response, it appears that any delay was due to Plaintiff's improper service.

### III.  Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be granted and Plaintiff's motion for summary judgment will be denied.  A separate Order will follow.


                                   _____/s/_____
                                   DEBORAH K. CHASANOW
                                   United States District Judge